[No. 53914-1-I. Division One. September 16, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. VIDAL LEE VINCENT, *Appellant*.

*Vidal Lee Vincent*, pro se.

*Gregory C. Link* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Lee D. Yates, Deputy*, for respondent.

¶1 ELLINGTON, J. — Two drive-by shootings led two brothers to a joint trial and multiple convictions. Vidal Vincent argues the admission of his nontestifying brother's statements violated his rights under the confrontation clause. He also argues that the court erred in denying his motions to sever, that there was insufficient evidence to support the verdict on the charge of drive-by shooting, that admission of the nontestifying victim's statements violated his federal and state confrontation clause rights under *Crawford v. Washington*,[1] and that his convictions for drive-by shooting and assault in the second degree violate double jeopardy. Finally, in a statement of additional grounds, Vincent argues a photomontage was impermissibly suggestive.

¶2 We hold that Vincent's confrontation clause rights were violated by admission of his brother's statements. This violation, however, was harmless beyond a reasonable doubt because other evidence against Vincent was overwhelming. Vincent's confrontation clause rights were also violated by admission of the nontestifying victim's statements, but this error too was harmless, for the same reason. We reject Vincent's other contentions and affirm.

## FACTS

¶3 On August 9, 2003 at approximately 7 P.M., 9-year-old Jared Hester and 12-year-old Francisco Gutierrez were riding their bikes in south Seattle after a "read and play" session at their church. A green Cadillac approached and slowed down, and the passenger fired a handgun in the direction of the two boys. The bullet hit the sidewalk next to their feet.

¶4 Later that evening, 16-year-old Shannon Thomas was standing on a corner on Rainier Avenue South. A green

---

[1] 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Cadillac drove up with its passenger lying fully reclined. The driver reached across and fired one shot at Thomas, hitting him in the chest. Jerome Robinson was standing behind Thomas, and the bullet grazed his hand.

¶5 Thomas was taken to Harborview Medical Center. He had lost 40 percent of his blood and was in shock. Surgery was required to stem the bleeding into Thomas's chest. Part of his lung was removed. In the recovery room, he told his mother that Vinson Carter-Vincent was the shooter. Thomas recovered, but disappeared during the trial and did not testify.

¶6 Three days after the shooting, Detective Bergmann visited Thomas in the hospital. Although Thomas was initially uncooperative, he identified the driver of the car by pointing at a montage photo and provided the name of the passenger. Bergmann testified at trial that after his interview with Thomas, Vidal Vincent became the second suspect in the shooting.

¶7 Jared and Francisco each identified Vidal Vincent as the person who fired at them. They also described the gun and the green Cadillac, which had a damaged trunk. In Vinson Carter-Vincent's apartment, police found a manual for a Glock semi-automatic handgun matching the boys' description. Multiple witnesses identified the green Cadillac as Vinson Carter-Vincent's car and identified Vinson Carter-Vincent as the driver and Vidal Vincent[2] as the passenger before and during the shooting of Thomas.

¶8 The State charged Vidal and Vinson with first degree attempted murder and first degree assault in the shooting of Thomas; two counts of second degree assault, arising out of the shot fired at the boys; drive-by shooting; and unlawful possession of a firearm.

¶9 While being held in the King County jail before trial, Vinson occupied a cell near Jason Speek and talked to Speek about shooting Thomas. The State sought to intro-

---

[2] Because it is necessary to refer to Vidal's brother, we use their first names hereafter, for the sake of clarity.

duce Vinson's statements to Speek. Vidal objected and sought severance, arguing that Speek's testimony would incriminate him. The court denied the motion to sever and entered a detailed ruling permitting Speek's testimony but requiring that Speek omit all reference to Vidal and refer only to "another person."[3]

¶10 Neither Vidal nor Vinson testified at trial. Vinson's girl friend and her mother both testified the brothers had been with them the entire evening. Speek testified in detail about Vinson's account of the shooting of Thomas and the surrounding events, including repeated references to another occupant of the Cadillac, referred to as "the other guy." The court instructed the jury that it could not consider an incriminating out-of-court statement made by one defendant as evidence against the other defendant.

¶11 The jury convicted both defendants on all charges. The trial court vacated the first degree assault convictions on double jeopardy grounds.

## DISCUSSION

¶12 *Admission of Codefendant's Statement.* Citing *Bruton v. United States,*[4] Vidal argues that his Sixth Amendment right to confront the witnesses against him was violated by the introduction of Vinson's statements to Speek. He also argues there was insufficient evidence to support his conviction as an accomplice to the attempted murder of Thomas. We agree with Vidal that the statements were improperly admitted, and we discuss these two issues together because the prejudice to Vidal, if any, occurred in the jury's consideration of the shooting of Thomas.

¶13 *Bruton* involved a joint trial in which the confession of one defendant incriminated both.[5] The defendant who

---

[3] Clerk's Papers at 89.

[4] 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

[5] *Id.* at 124.

had made the statement did not testify. The trial court admitted the statement without redaction and instructed the jury to consider the statement only against the defendant who made it. The United States Supreme Court held that, despite the limiting instruction, introduction of such evidence at a joint trial violates the nonconfessing defendant's Sixth Amendment right to cross-examination:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.[6]

¶14 Since *Bruton*, the United States Supreme Court has twice addressed the admission of such statements where an attempt has been made to redact the statement to eliminate reference to the other defendant. In *Richardson v. Marsh*,[7] the confession of the nontestifying codefendant was redacted to omit all indication that the defendant was present during an incriminating conversation between two people in a car. The defendant then testified she had been in the car at the time. The Supreme Court held that admission of one defendant's confession, redacted to omit all reference to another defendant, does not, on its face, violate the other defendant's Sixth Amendment confrontation rights, even where the statement later becomes incriminating when linked with other evidence.[8] The Court left for another day the admissibility of a confession where the second defendant's name is replaced by a pronoun.[9]

---

[6] *Id.* at 135-36 (citation omitted).

[7] 481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987).

[8] *Id.* at 208.

[9] *Id.* at 211 n.5.

¶15 In *Gray v. Maryland*,[10] six men participated in beating a man to death. One participant, Bell, confessed, detailing his participation and that of Gray (as well as another man, who later died). At the trial of Bell and Gray, Bell's statement was admitted with Gray's name replaced by the word "deleted" or a blank space. The Supreme Court held these redactions insufficient to comply with *Bruton*, because the word "deleted" or a blank "obviously refer[s] directly to someone, often obviously the defendant, and . . . involve[s] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."[11] The court noted that the redacted statement could have used the phrase "other guys," which would not have pointed to Gray because there were multiple participants.[12]

■■ ¶16 Washington cases have also addressed this issue. In *State v. Vannoy*,[13] the codefendants' statements described participants driving around in a car after the crime. The statements were redacted so that names were replaced by "we." Police had observed all the defendants in the car, however, and the court held the redaction violated *Bruton*, because the jury "could readily conclude that defendant Thomas Vannoy was included in the 'we's' of the codefendants' statements."[14] But in *State v. Medina*,[15] a redaction replacing two codefendants' names with "other

---

[10] 523 U.S. 185, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998).

[11] *Id.* at 196.

[12] *Id.* at 196-97.

[13] 25 Wn. App. 464, 610 P.2d 380 (1980).

[14] *Id.* at 474. In similar circumstances, the Supreme Court of Arkansas recently concluded that admission of a nontestifying codefendant's statement violated *Bruton* even though the statement was redacted to use "him" and "he." *State v. Jefferson*, 359 Ark. 454, 198 S.W.3d 527 (2004). The robbery involved three participants. One pleaded guilty and was named in the confession, as was the confessor; the codefendant was referred to as "he" or "him." The court concluded that the redacted statement violated *Bruton* because the jury could easily infer from the fact there were three participants, two of which were identified, that "he" or "him" was the codefendant.

[15] 112 Wn. App. 40, 48 P.3d 1005 (2002).

guys," "the guy," and "one guy" was upheld because, as redacted, the statement did not incriminate any individual:

> The statement was altered in such a way that it became so ambiguous that it is impossible to track the activities of any particular "guy" referenced in the statement. . . . Although three persons were charged, the testimony established that there were approximately six individuals involved. Therefore, the references to "the guys" and "a guy" did not create the inference of identification of [the codefendants].[16]

¶17 The State contends that under *Gray* and *Medina*, replacing a defendant's name with a pronoun or a phrase such as "the other guy" satisfies *Bruton* under any circumstances. We disagree with this reading of the cases. The question is not the precise words used in a redaction, but whether the redaction is sufficient to protect the codefendant from the prejudice of a statement he cannot cross-examine—that is, to prevent the jury from concluding the redacted reference is obviously to the codefendant, making it impossible for the jury to comply with the court's instruction to consider the evidence only against the defendant who made the statements.

¶18 Here, there were only two participants in the crimes and only two defendants. On direct examination, Speek testified repeatedly that there was only one "other guy" with Vinson before, during, and after the shooting of Thomas. As in *Vannoy*, the only reasonable inference the jury could have drawn from Speek's references to the "other guy" was that the other guy was Vidal. The redaction thus failed in its purpose, and admission of Speek's testimony in the joint trial violated Vidal's rights under *Bruton*.

¶19 A confrontation clause error is harmless if the evidence is overwhelming and the violation so insignificant by comparison that we are persuaded, beyond a reasonable

---

[16] *Id.* at 51. *See also State v. Herd*, 14 Wn. App. 959, 964, 546 P.2d 1222 (1976) (codefendant's statement redacted to refer to "another" did not violate *Bruton* where there were two codefendants but four participants in the crime); *State v. Ferguson*, 3 Wn. App. 898, 905-06, 479 P.2d 114 (1970) (no violation of *Bruton* where codefendant's statement did not name codefendant as an accomplice or reasonably suggest that there was an accomplice).

doubt, that the violation did not affect the verdict.[17] Considerations include the importance of the witness's testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case.[18]

¶20 Speek's testimony contributed evidence of Vinson's premeditated intent in the shooting of Thomas and offered the most complete explanation for the brothers' activities on the day of the crimes. Speek testified that earlier in the day, Vinson and "the other guy" had been involved in a gang fight, "the other guy" had been fist-fighting with "D-Dub" gang members near the QFC, and Vinson had tried to shoot a D-Dub member but "the other guy" had been in the line of fire. Speek testified that Vinson and "the other guy" then left the scene to go to a barbeque to get more people and guns, and when they returned to the area of the QFC, Vinson shot Thomas because he was a D-Dub.

¶21 There was, however, ample other evidence that Vidal facilitated Vinson's shooting of Thomas. One witness saw Vidal in the passenger seat of the green Cadillac an hour or two before the shooting of Thomas. Another saw him in the Cadillac just a few minutes before the shooting. The Cadillac was described as driving around the QFC parking lot with the passenger hanging out of the window, looking around. A further witness, Kevin Williams, was standing on a curb near the QFC. Williams knew the brothers, although he could not always tell them apart. He saw them in the green Cadillac as it left the QFC parking lot and stopped at a light. At the light, the Cadillac was in the curb lane near Williams. The passenger seat was "laid

---

[17] *See Schneble v. Florida*, 405 U.S. 427, 430, 92 S. Ct. 1056, 31 L. Ed. 2d 340 (1972) ("In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."); *Harrington v. California*, 395 U.S. 250, 254, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969).

[18] *Schneble*, 405 U.S. at 432.

all the way back."[19] The Cadillac then crossed the intersection and stopped at the far corner. The driver sat looking at everybody on the corner with his arm draped over the passenger, pointing the gun out the passenger side window. The Cadillac had been fully stopped for about five seconds when the shot was fired.

¶22 Witnesses also testified about a gang-related motive for the shooting, about rivalries between Seattle gangs, and about Vidal's association with members of the Low Profile gang. One witness testified that Thomas looked like his brother, Nate, who was a Hoover Crip, and that either Vinson or Vidal had previously fought with Nate. A bus driver saw the Cadillac leave the scene of the shooting at a high rate of speed, prompting him to call 911.

¶23 The question is whether this is such overwhelming evidence that the introduction of Speek's statements in the joint trial can be deemed harmless to Vidal.[20] The State suggests this question is answered by *In re Personal Restraint of Sarausad*,[21] in which we held that evidence sufficient to convict a defendant as an accomplice to a drive-by shooting is sufficient to convict him as an accomplice to intentional murder.[22] But *Sarausad* is inapposite. There, on collateral review, we held the evidence was

---

[19] Report of Proceedings (RP) (Jan. 21, 2004) at 68. Vidal contends that this was "no more an act of complicity than an act of self preservation, an instinctive response to the discharge of a firearm inches away." Appellant's Br. at 16. But Vidal had adopted his reclined position before Vinson leaned across him, and his position required moving the seat, not just his body. Moments before, Vidal was seen leaning out of the car window, looking around. His reclined posture could have no likely purpose except to facilitate Vinson's shot out the window.

[20] Vidal argues that the harmless error doctrine does not apply because the right to confrontation under the Washington Constitution is absolute. However, Vidal does not provide an analysis under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), contending that *State v. Foster*, 135 Wn.2d 441, 957 P.2d 712 (1998) addresses all confrontation clause issues under the state constitution. We rejected this argument in *State v. Mason*, 127 Wn. App. 554, ¶¶ 30-31, 110 P.3d 245 (2005). Therefore, in the absence of a *Gunwall* analysis, we reject Vidal's state constitutional argument.

[21] 109 Wn. App. 824, 39 P.3d 308 (2001).

[22] Vidal argues that *Sarausad* was wrongly decided. Because our disposition of this case does not require it, we do not revisit *Sarausad*.

sufficient if it showed defendant's knowledge that his actions would facilitate shooting a gun from a car window toward people.[23] Here the question is whether admission of Speek's testimony was "too damaging and prejudicial" to be deemed harmless beyond a reasonable doubt.[24]

¶24 The principal effect of Speek's testimony was to show Vinson's premeditated intent and evidence of Vidal's ("the other guy's") complicity. Vidal, however, did not have to share Vinson's premeditated intent; he needed only to know his conduct would facilitate Vinson's shooting of Thomas.[25] As to that question, and as to Vidal's complicity, Speek's testimony was merely cumulative of other, overwhelming evidence—multiple witnesses provided the same context evidence and established Vidal's participation. We are therefore persuaded that Speek's testimony was harmless beyond a reasonable doubt.

¶25 Vidal next contends that in questioning Speek and in closing argument, the prosecutor improperly encouraged the jury to use Vinson's statements against Vidal, in direct violation of his Sixth Amendment right to confrontation under *Richardson*, 481 U.S. 200. Vidal argues that the prosecutor improperly asked Speek whether Vinson said he returned to a barbeque with the same person he had been with earlier. But this question and answer were not the subject of any objection and cannot be said to be flagrant and ill-intentioned misconduct.[26]

¶26 As to closing, Vidal contends the prosecutor drew a direct link from Speek's testimony to Vidal when he said, "We also have the actions of the other people in the car, the

---

[23] *Sarausad*, 109 Wn. App. at 836.

[24] *Vannoy*, 25 Wn. App. at 475; *Schneble*, 405 U.S. at 430.

[25] *See State v. Roberts*, 142 Wn.2d 471, 512, 14 P.3d 713 (2000); *State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000).

[26] *See State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994) (failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury).

other person, Vidal."[27] Again, Vidal made no objection. In context, these remarks have no clear link to Speek's testimony. Rather, the prosecutor argued the inferences to be drawn from eyewitness testimony describing Vidal's presence and behavior in the car. There was no misconduct.

¶27 Affirmed.

¶28 The balance of this opinion having no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

Cox, C.J., and KENNEDY, J., concur.

Reconsideration denied January 19, 2006.

Review denied at 158 Wn.2d 1015 (2006).